786 P.2d 551

**STATE of Idaho, Plaintiff-respondent,**

v.

**Eugene Louis YOUNGBLOOD, Defendant-appellant.**

**No. 17542.**

Supreme Court of Idaho.

Jan. 19, 1990.

James H. Paulsen, Sandpoint, for defendant-appellant.

Jim Jones, Atty. Gen., Jack B. Haycock (argued), Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Chief Justice.

Defendant Eugene Youngblood appeals from a jury conviction of robbery and second degree burglary. He seeks reversal of his conviction based on several grounds: denial of speedy trial, denial of fair trial, and denial of effective assistance of counsel. We affirm the conviction.

I

At about 3:30 in the morning of March 7, 1987, a masked gunman entered the Pink Lion, a retail store in Bonners Ferry, and robbed the store's owner, James Farber. After removing a pistol from beneath Farber's jacket, the gunman led Farber to the store's concealed floor safe, compelled Farber to open the safe and took the money from inside. The gunman then taped Farber's hands and feet together and left him lying face down on the floor. Farber heard the gunman leave through the back door. Shortly thereafter, Farber broke free, called his wife and the police.

That same morning, Bonners Ferry Police Officer Parmenter was in a patrol car facing the Pink Lion from one block away. At about 3:40 a.m. Officer Parmenter saw movement near the back door of the Pink Lion. He drove up closer and saw Youngblood step away from the door, turn to-

ward the car and then run away. Officer Parmenter gave chase and caught up to him in a parking lot after Youngblood slipped and fell. When Youngblood reached down into the bag he was carrying, Officer Parmenter pulled out his gun and shouted, "Freeze!" Youngblood then removed his hand from beside the bag and pulled a plastic glove off one hand. Officer Parmenter told Youngblood to move away from the bag which was then on the ground in the parking lot and to place his hands on the patrol car. As Youngblood approached the vehicle he pulled another plastic glove off his other hand. Officer Parmenter then handcuffed Youngblood.

Believing that Youngblood had committed some crime, Officer Parmenter radioed for backup. After the backup officer arrived, Officer Parmenter walked over to the open bag lying on the ground, looked inside, and saw some wrapped bundles (later found to contain the stolen money), a 9 mm. gun with a clip inside, an extra clip, and a flashlight. Officer Parmenter then patted Youngblood down, removed his wallet, and pulled out Youngblood's Navy identification card. Just then, Parmenter received a radio report that Farber at the Pink Lion had just been robbed. Youngblood was then placed under arrest.

At trial, Youngblood testified concerning additional facts. Youngblood said that he had gone to the Pink Lion that night after closing hours because someone, a man, previously told him that he was going to rob the store early that morning. Youngblood said he wanted to prevent the robbery. While waiting for the man by the back door, Youngblood saw Officer Parmenter's police car park a block away from the store. Just then, Youngblood testified, the back door opened and the man came out holding a bag. Youngblood said he yelled at the man, grabbed the bag and ran. Officer Parmenter caught up with Youngblood while the "real robber," according to Youngblood, escaped. At trial, Youngblood repeatedly refused to identify this man.

The jury found Youngblood guilty of robbery and second degree burglary, apparently choosing to disbelieve his story.

## II

■ On appeal, Youngblood first alleges that he was denied a speedy trial because his trial was held in excess of ten months after the information was filed and that he had never waived his statutory right to a speedy trial. I.C. § 19–3501. After this argument was set forth in appellant's brief, the record was augmented to show the existence of a notarized "WAIVER OF SPEEDY TRIAL" signed by Youngblood and his counsel at the time. The waiver reads as follows: "COMES NOW the above entitled defendant [Eugene L. Youngblood], and does hereby knowingly and voluntarily waive his right to speedy trial in the above entitled cause." We find this notarized waiver to be dispositive of Youngblood's claim of denial of speedy trial.

## III

■ Next, Youngblood asserts that he was denied a fair trial because on the first day of trial he wore handcuffs as he was brought to the courtroom by a plainclothes officer. Youngblood moved for a mistrial and argued that it was reversible error to unnecessarily shackle him in front of prospective jurors who may infer his guilt before trial. To determine which prospective jurors saw this, the trial judge conducted individual voir dire in chambers with all prospective jurors. As indicated by the record, the trial judge asked each prospective juror the following questions: (1) "Did you observe the Defendant Eugene Youngblood this morning prior to his entry into the courtroom at the time he was introduced?" (2) "Has anybody spoken with you or have you spoken to anyone about Mr. Youngblood's appearance here this morning?" If either question elicited an affirmative response, the prospective juror was then asked what he or she observed or heard. After these voir dire proceedings concluded, the trial judge told counsel, "We have forty-one jurors who

have not seen or heard about the business of being cuffed." Youngblood's counsel then asked that the nine prospective jurors be dismissed for cause. As he observed during the questioning of the prospective jurors, those nine indicated that they had seen Youngblood wearing handcuffs. The trial judge granted Youngblood's motion and the nine were excused. Based on our reading of the record we find that the trial judge acted properly in dismissing the nine tainted prospective jurors as requested by defense counsel and committed no reversible error.

■ Nevertheless, on appeal, Youngblood asserts that there is no way to determine from the record whether the jury, drawn from the remaining forty-one prospective jurors, was prejudiced against him because of the handcuff incident. Youngblood argues that the voir dire proceedings were not recorded as is required by I.C. § 1–1103 and that it therefore should be presumed that the jury was prejudiced against him. However, the record reflects that the voir dire of the jury panel in the judge's chambers was reported by the official court reporter, Douglas Davis. The minutes of the court reflect that the voir dire proceeding took place in chambers on February 9, 1988, and that the proceedings were "reported by D. Davis." Douglas Davis is the official court reporter in that district. The reporter's transcript contains a transcription of the proceedings to the point where the entire venire was administered the oath regarding the "questions that you are going to be asked during the voir dire examination." After the oath was administered to the entire jury panel by the clerk, the reporter's transcript states:

(Whereupon each and every jury panel member was brought into Court Chambers and asked the following questions: Did you observe the Defendant, Eugene Youngblood this morning prior to his entry into the courtroom at the time he was introduced? Has anybody spoken with you or have you spoken to anyone about Mr. Youngblood's appearance here this morning?)

If the appellant's objection to the reporter's transcript is that the response to the two questions posed to each of the individual jurors should have been transcribed in the reporter's transcript, the appellant should have followed the procedure set out in I.A.R. 29 which states in part:

The parties shall have 21 days from the date of the service of the transcript and the record within which to file objections to the transcript or the record, including requests for corrections, *additions* or deletions. In the event no objections to the reporter's transcript or clerk's or agency's record are filed within said 21–day time period, the transcript and *record shall be deemed settled.*

(Emphasis added.)

The clerk's record on appeal contains no motion for an addition to the reporter's transcript to include the responses of the jurors. Accordingly, the appellant cannot complain now that the reporter's transcript did not include the responses of the prospective jurors to the two questions asked. I.A.R. 29.

Regardless of the failure of the appellant to request the addition to the reporter's transcript, the existing record is sufficient to demonstrate that in the voir dire proceedings with each individual juror, the trial judge dismissed all prospective jurors who testified that they had seen Youngblood enter the courtroom in handcuffs. Thus, immediately following the portion of the reporter's transcript cited above in which the reporter states that "each and every jury panel member was brought into Court Chambers and asked the following questions," the reporter's transcript states:

THE COURT: We have forty-one jurors who have not seen or heard about the business of being cuffed. Now, do we have any requests or motions with respect to those persons who have indicated they saw, spoke to or heard persons speaking about being in handcuffs?

MR. ELLIOTT: I have nine people here that have on my list indicated they have seen the cuffs. I would ask that they be dismissed for cause.

Thereafter the court discharged those nine jurors from the jury panel.

Based upon the existing clerk's record and reporter's transcript, we conclude that the trial court did not err in empaneling the jury which tried Youngblood.

## IV

■ Youngblood asserts that he was denied a fair trial due to the admission of testimony which showed that Youngblood had access to the 9 mm. gun found in the bag carried by Youngblood. This gun belonged to George Hopkins and was discovered missing from his home on March 17, 1987, ten days after the robbery. Over defense counsel's objection, Hopkins testified as a state's witness that his girlfriend, the defendant's ex-wife Lilly Youngblood, had access to his home and knew where the gun was located. Earlier testimony revealed that Youngblood was staying with his ex-wife three or four nights a week in February and March of 1987.

Youngblood argues that it was reversible error to allow Hopkins' testimony because its prejudice outweighed its probative value. Youngblood contends this testimony was offered to imply Youngblood's criminal propensity by linking him with other criminal conduct, i.e., theft, unrelated to the crime charged.

We find this argument without merit. The evidence does not link Youngblood to an alleged gun theft. Rather, it merely shows that Youngblood's ex-wife had access and opportunity to take the gun from its owner and give it to Youngblood to use in the robbery. Furthermore, the evidence shows that Lilly Youngblood previously worked in the Pink Lion; that she was aware that the owner Farber carried a pistol under his jacket; and that she was familiar with closing procedure and the location of the hidden floor safe. A Pink Lion employee testified that Youngblood was with his ex-wife in the store the evening before the robbery. Hopkins' testimony also rebuts Youngblood's defense that he innocently received the bag containing Hopkins' gun from the unnamed "real robber." We conclude that Hopkins' testimony was highly probative because it explained how Youngblood obtained access to the gun which was used in the robbery. There was no error in the admission of the evidence.

## V

Youngblood finally urges this court to reverse his conviction because the performance of his trial counsel was so seriously deficient that he was not functioning as the "counsel" guaranteed by the sixth amendment to the United States Constitution and art. 1, § 13, of the Idaho Constitution. Youngblood specifically alleges three errors by trial counsel: (1) failure to move for suppression of evidence which was the product of a warrantless search and seizure, (2) failure to have state evidence independently analyzed, and (3) failure to move for dismissal because Youngblood's speedy trial rights were violated. These specific arguments are discussed in turn, with the exception of the latter because the augmented record clearly shows that Youngblood waived his speedy trial rights.

The right to effective assistance of counsel is guaranteed under the United States and Idaho constitutions. There are two requirements which Youngblood must show in order to prove a violation of his right to effective assistance of counsel.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674

(1984), *Gibson v. State*, 110 Idaho 631, 634, 718 P.2d 283, 286 (1986).

## A.

 First, Youngblood argues that his trial counsel failed to move to suppress the contents of the bag he was holding when stopped by Officer Parmenter. Youngblood asserts that after Officer Parmenter stopped and handcuffed him, the officer searched the bag's contents illegally and without a warrant and his counsel should have moved for the suppression of that evidence. However, there is no evidence in the record to support this contention. The record indicates that the bag's contents were in plain view and that the bag had been left by Youngblood on the parking lot pavement with the top open. At trial Officer Parmenter testified that after he handcuffed Youngblood he "walked over to the bag and I looked inside of the bag." When Officer Parmenter looked inside the bag he said he

> could see there were some different colors of wrapped bundles, pinks and oranges or something of that nature that were wrapped with rubberbands and they had black writing on it. There was also a 9 mm. automatic gun with a clip inside, cocked and loaded, laying right on top of the bags and there was an extra clip and a flashlight in the side pouch that were just plain view as far as looking at the bag in open view, you could look right at them.

Because the bag's contents were in plain view, the officer's looking into it was not a search, and there is no basis for a claim of ineffective assistance of counsel for failure to move to suppress these items as the fruits of an illegal search.[1]

## B.

Second, Youngblood argues that his trial counsel failed to have numerous items of physical evidence independently analyzed. Youngblood asks us to assume that because his trial counsel did not call an expert witness to testify concerning physi-

cal evidence (e.g., hair samples and the coveralls and ski mask of the robber), this evidence was not independently analyzed. We cannot assume that merely because no expert witness was called that trial counsel was ineffective. There are a number of explanations which could explain the failure to produce an expert to testify, including the possibility that an independent expert may have analyzed these items and told Youngblood's trial counsel that his testimony could not help them. There has been no showing on this record that Youngblood's trial counsel failed to have physical evidence independently tested, or that his failure to call an expert witness was so deficient as to constitute ineffective assistance of counsel. Accordingly, there is no merit to this claim.

The judgment of the District Court is affirmed.

BISTLINE and BOYLE, JJ., and TOWLES, J. pro tem., concur.

JOHNSON, Justice, concurring specially.

I concur in the opinion of the Court and write only to express my special concurrence in part V of the opinion. There the opinion appears to equate the standard for effective assistance of counsel under the United States Constitution and the Idaho Constitution. I point out that in *State v. Charboneau*, 116 Idaho 129, 137, 774 P.2d 299, 307 (1989) we said:

> From [*State v.*] *Aragon* [, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988) ] we are bound to conclude that it remains the burden of one claiming ineffective assistance of counsel under the Idaho Constitution to prove that "counsel's conduct contributed to the conviction."

In my view, applying this standard would not change the result in this case.

---

1. It has been suggested that even if a search had been conducted, the bag's contents would nevertheless be admissible under the inevitable discovery rule. Because the record indicates that the bag's contents were in Officer Parmenter's plain view, it is not necessary to discuss the admissibility of the contents under the inevitable discovery rule.